J-A18023-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| CODY ELLEN ALTERIO | |
| Appellant | No. 2147 MDA 2013 |

Appeal from the Judgment of Sentence of November 12, 2013
In the Court of Common Pleas of Centre County
Criminal Division at No.: CP-14-CR-0001903-2012

BEFORE:  LAZARUS, J., WECHT, J., and MUSMANNO, J.

MEMORANDUM BY WECHT, J.:                    **FILED AUGUST 29, 2014**

Cody Alterio appeals her November 12, 2013 judgment of sentence. We affirm.

On September 10, 2012, Margie Schreffler called the Bellefonte Police Department to report that Alterio was "driving around snorting bath salts[1] and saying something about not letting the bitch out of her trunk until she got answers."  Notes of Testimony ("N.T."), 6/17/2013, at 6.  Corporal Robert Igoe ("Corporal Igoe") then attempted to locate Alterio, and eventually spotted her exiting a silver Nissan Altima, which was parked in front of Alterio's parent's residence.

_____

1     "Bath salts" is the street name of a category of designer drugs that contain synthetic cathinones such as mephedrone.  **See** 35 P.S. §§ 780–104(1)(iii)(17)–(25), (vii)(1)–(8), (viii)(1)–(9).

Corporal Igoe spoke with Alterio, and noted that she was "very animated and not making a lot of sense." *Id.* at 9. Alterio admitted to Officer Andy Berry ("Officer Berry"), who accompanied Corporal Igoe during this encounter, that she had recently tried bath salts. Alterio stated that her estranged boyfriend had been sneaking another woman into the trunk of her vehicle. Convinced that someone was hiding in her vehicle, Alterio requested that Corporal Igoe search her trunk.

While searching Alterio's trunk, Corporal Igoe, now joined by Officer Berry, found two small clear plastic bags that are commonly used to package illegal drugs. Thereafter, Alterio consented to a search of her entire vehicle. During that search, Officer Berry and Corporal Igoe discovered fifty-seven blue wax paper stamp bags in the passenger compartment of Alterio's vehicle. Six of those stamp bags contained residue that tested positive for heroin. Additionally, Officer Berry and Corporal Igoe found a small zip-top bag in Alterio's vehicle, which contained cocaine residue.

Alterio failed a standard field sobriety test and subsequently was arrested and charged with two counts of driving under the influence of a controlled substance and one count of possession of drug paraphernalia.[2] A drug recognition expert evaluated Alterio and concluded that she was under the influence of bath salts and heroin. Alterio also consented to a blood test,

---

[2] 75 Pa.C.S. §§ 3802(D)(1)(iii), 3802(D)(2), and 35 P.S. § 780-113(A)(32), respectively.

which revealed the presence of morphine[3] in Alterio's blood in the amount of forty-eight nanograms per milliliter.

Alterio proceeded to a non-jury trial on June 17, 2013. During that trial, Alterio objected to the Commonwealth's blood toxicology report, which she contended was inadmissible pursuant to 75 Pa.C.S. § 1547(c)(4). N.T. at 45. Specifically, Alterio argued that the report was inadmissible because the blood test had been conducted on Alterio's "blood serum" rather than on her "whole blood."[4] *Id.* The trial court admitted the toxicology report into

_____

[3] Morphine is both a schedule II controlled substance and a metabolite of heroin, which is a schedule I controlled substance. *See* 35 P.S. §§ 780-101, *et seq*.

[4] We have explained the distinction between "whole blood" and "blood serum" in the alcohol-related DUI context as follows:

> [Blood s]erum is acquired after a whole blood sample is centrifuged, which separates the blood cells and fibrin, the blood's clotting agent, from the plasma—the clear liquid is the blood serum. When blood serum is tested the results will show a blood alcohol content which can range from between [ten] to [twenty] percent higher than a test performed on whole blood. The reason for this is because the denser components of whole blood, the fibrin and corpuscles, have been separated and removed from the whole blood, leaving the less dense serum upon which the alcohol level test is performed. The value of the blood alcohol content in the serum is then determined. Because the serum is less dense than whole blood, the weight per volume of the alcohol in the serum will be greater than the weight per volume in the whole blood. Thus, an appropriate conversion factor is required to cal[c]ulate the corresponding alcohol content in the original whole blood sample.

*Commonwealth v. Michuck*, 686 A.2d 403, 405–06 (Pa. Super. 1996) (internal citations, quotation marks, and footnotes omitted).

evidence over Alterio's objection, and subsequently found Alterio guilty of two counts of driving under the influence of a controlled substance and one count of possession of drug paraphernalia.[5] On September 6, 2013, the trial court sentenced Alterio to ninety days to five years' incarceration.

On November 27, 2013, Alterio filed a timely notice of appeal.[6] On December 2, 2013, Alterio filed a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). On January 15, 2014, the trial court issued an opinion pursuant to Rule. 1925(a).

Alterio presents the following issue for our consideration:

> Because 75 Pa.C.S. §1547(c)(4) specifically requires the Department of Health to establish minimum levels of a schedule I, non-prescribed schedule II, and non-prescribed schedule III substances or their metabolites in blood in order for the test results to be admissible, and case law clearly defines blood as whole blood, the trial court erred as a matter of law in admitting Alterio's blood test results allegedly containing morphine into evidence over Alterio's objections, as the alleged amount of morphine found in Alterio's blood was not a whole blood level as the testimony clearly showed what went into the chromatograph for testing was not whole blood, and no conversion factor was testified to that gave a whole blood equivalent test result.

_____

[5] On June 17, 2013, the Commonwealth withdrew one count of DUI (75 Pa.C.S. § 3802(d)(2)), and replaced it with a charge under a different subsection (75 Pa.C.S. § 3802(d)(1)(ii)).

[6] On September 13, 2013, Alterio timely filed a motion to modify her sentence, which the trial court granted on November 7, 2013. On November 12, 2013, the trial court modified Alterio's sentence to run concurrently to her sentence at another docket number. Accordingly, Alterio's November 27, 2013 notice of appeal was timely filed. *See* Pa.R.A.P. 903.

Brief for Alterio at 1 (minor modifications for clarity).

Alterio principally argues that the trial court erred in admitting the results of her blood test because the Commonwealth conducted that test on Alterio's blood serum rather than on a whole blood sample. The admission of evidence is within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. **Commonwealth v. Priest**, 18 A.3d 1235, 1240–41 (Pa. Super. 2011). An abuse of discretion occurs when the trial court misapplies the law or "the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record." **Commonwealth v. Borovichka**, 18 A.3d 1242, 1253 (Pa. Super. 2011) (citation omitted).

Alterio was convicted under DUI subsections 3802(d)(1)(iii) and 3802(d)(1)(ii), which provide as follows:

> An individual may not drive, operate or be in actual physical control of the movement of a vehicle under any of the following circumstances:
>
> (1)  There is in the individual's blood **any** amount of a:
>
> (i)  Schedule I controlled substance, as defined in the act of April 14, 1972 (P.L. 233, No. 64), known as The Controlled Substance, Drug, Device and Cosmetic Act;
>
> (ii)  Schedule II or Schedule III controlled substance, as defined in The Controlled Substance, Drug, Device and Cosmetic Act, which has not been medically prescribed for the individual; or
>
> (iii)  metabolite of a substance under subparagraph (i) or (ii).

75 Pa.C.S. § 3802(d) (footnote omitted; emphasis added).

The admissibility of chemical testing in DUI cases is governed by 75 Pa.C.S. § 1547(c). In pertinent part, that provision states:

> In any summary proceeding or criminal proceeding in which the defendant is charged with a violation of section 3802 or any other violation of this title arising out of the same action, the amount of alcohol or controlled substance in the defendant's blood, as shown by chemical testing of the person's breath, blood or urine, which tests were conducted by qualified persons using approved equipment, shall be admissible in evidence.
>
> * * *
>
> (4) For purposes of blood testing to determine the amount of a Schedule I or nonprescribed Schedule II or III controlled substance or a metabolite of such a substance, the Department of Health shall prescribe minimum levels of these substances which must be present in a person's blood in order for the test results to be admissible in a prosecution for a violation of [sub]section 1543(b)(1.1), 3802(d)(1), (2) or (3) or 3808(a)(2).

75 Pa.C.S. § 1547(c) (footnote omitted). Pursuant to subsection 1547(c)(4), the Pennsylvania Department of Health has set the minimum detection level for morphine at five nanograms per milliliter.[7] **See** 42 Pa. Bull. 110 (Jan. 7, 2012).

Instantly, Alterio's blood toxicology report indicated that her blood contained forty-eight nanograms per milliliter of morphine, a level well

_____

[7] In 2014, the Department of Health decreased the threshold amount of morphine required to be present in an admissible blood sample to two nanograms per milliliter. **See** 44 Pa. Bull. 132 (Jan. 4, 2014). Nevertheless, at the time of Alterio's arrest, the minimum quantitation limit for morphine was five nanograms per milliliter.

above the Department of Health's threshold for admissibility. Alterio, however, takes issue with the fact that only her blood serum, rather than her whole blood, was tested. The gist of Alterio's argument is that subsection 1547(c)(4) requires that the Commonwealth establish that the amount of a controlled substance present in a defendant's whole blood (rather than blood serum) exceeded the Department of Health's minimum detection level. Hence, we must determine whether section 1547 imposes such a requirement.

The interpretation of a statute presents a question of law, as to which our standard of review is *de novo*. ***Commonwealth v. Van Aulen***, 952 A.2d 1183, 1184 (Pa. Super. 2008).

> Our task in construing a statute is to ascertain and effectuate the intention of the General Assembly. Every statute shall be construed, if possible, to give effect to all its provisions. When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.

***Commonwealth v. Steffy***, 36 A.3d 1109, 1111 (Pa. Super. 2012) (quoting ***Commonwealth v. Sarapa***, 13 A.3d 961, 964 (Pa. Super. 2011)).

Although 75 Pa.C.S. § 1547(c) indicates that the results of blood tests are admissible in DUI proceedings, and grants to the Department of Health the authority to regulate the procedures and equipment used to conduct those tests, the statute does not dictate any particular form of blood that must be tested. Instead, the statute merely refers to the generic term "blood," which the General Assembly has not defined within the Motor

- 7 -

Vehicle Code.[8]  Because "blood" may refer either to whole blood or to its component parts, we find the term to be ambiguous.  **See Commonwealth v. Dagnon**, 605 A.2d 360, 362 (Pa. Super. 1992) ("Since there is no question that both whole blood and blood serum may be utilized to analyze a person's blood alcohol content, we find that term to be ambiguous.").

In **Commonwealth v. Dagnon**, 605 A.2d 360 (Pa. Super. 1992), we declined to construe the term "blood," as used in a prior version of section 1547 of the Motor Vehicle Code, to mean specifically "whole blood."  In that case, Dagnon, a motorist who had been involved in a fatal vehicle accident, was charged with, *inter alia*, DUI.  In its prosecution, the Commonwealth sought to admit the results of Dagnon's post-accident blood alcohol test, which was conducted on Dagnon's blood serum.

_____

[8]   The General Assembly has defined other related phrases that are instructive.  For example, "[c]hemical test or testing" is defined as:

> [a]nalysis performed on a biological material, including but not limited to breath, blood or urine, to determine the identity or concentration or both of particular constituents such as alcohol or controlled substances.  **Test procedures may rely on one or more physical or chemical properties of the constituent and utilize instrumental or chemical analysis techniques to accomplish the determination.**

75 Pa.C.S. § 102 (emphasis added).  Similarly, our Motor Vehicle Code defines a "[b]lood delivery vehicle" as "[a]ny vehicle which is used or intended to be used and is maintained or operated for the purpose of transporting blood **or blood products** on an emergency basis." ***Id.*** (emphasis added).  The language used by the General Assembly in defining these terms does not demonstrate any clear intent to distinguish between whole blood and blood serum.

Dagnon filed a pretrial motion to suppress the blood serum test results, arguing that they were inadmissible pursuant to subsection 1547(c). *See* 75 Pa.C.S. § 1547(c) ("[T]he amount of alcohol or controlled substance in the defendant's blood, as shown by chemical testing of the person's . . . blood . . . , shall be admissible in evidence."). The trial court granted Dagnon's motion to suppress, concluding that subsection 1547(c) requires blood alcohol tests to be conducted on whole blood in order to be admissible in DUI prosecutions.

On appeal, this Court reversed the trial court's suppression order:

> With regard to the construction of the term "blood," we note that the Department, in performance of its regulatory function under 75 Pa.C.S. § 1547(c), published a list covering the year in which the within incident occurred that approved various laboratories to conduct blood alcohol tests utilizing both whole blood and blood serum. *See* 20 Pa.Bull. 306. Consequently, it has interpreted the term to include blood in either of those forms. Since the interpretation that an administrative agency gives to a statutory provision that it is charged with applying is entitled to deference, *see Masland v. Bachman*, 374 A.2d 517 (Pa. 1977), and since we find the Department's interpretation to be reasonable, we adopt it as being in conformity with legislative intent.

*Dagnon*, 605 A.2d at 362 (citations modified).

Since our decision in *Dagnon*, the General Assembly has made substantive amendments to section 1547, including the addition of subsection 1547(c)(4), which directs the Department of Health to establish minimum levels of controlled substances required to be present in admissible test results. Moreover, our DUI statute has also undergone major revisions

post-*Dagnon*. *See* 75 Pa.C.S. § 3731 (repealed by 2003, Sept. 30, P.L. 120, No. 24, § 14, effective Feb. 1, 2004). Thus, Alterio's claim requires us to re-examine section 1547.

It is well-settled that our task in construing a statute is to ascertain and effectuate the intent of the General Assembly. *Steffy*, *supra*. In order to determine the General Assembly's intent in passing the provision, we may examine: (1) the occasion and necessity for the statute; (2) the circumstances under which it was enacted; (3) the mischief to be remedied; (4) the object to be attained; (5) the former law, if any, including other statutes upon the same or similar subjects; (6) the consequences of a particular interpretation; (7) the contemporaneous legislative history; and (8) legislative and administrative interpretations of such statute. 1 Pa.C.S. § 1921(c). In this instance, we base our analysis primarily upon the Department of Health's interpretation of section 1547 as demonstrated by the pervasive regulatory framework that the Department has set forth.

As we noted in *Dagnon*, the Department of Health, as is required by section 1547, has issued extensive regulations relating to the screening of blood for the presence of alcohol and controlled substances and the procedures and equipment to be used to conduct such tests. *See e.g.,* 28 Pa. Code 5.1–5.104. For example, the Department has complied with the dictates of subsection 1547(c)(2)(ii), which provides as follows:

> (ii) For purposes of blood and urine testing to determine blood alcohol or controlled substance content levels, the procedures and equipment prescribed by the Department of

- 10 -

> Health shall be reviewed within 120 days of the effective date of this subparagraph and at least every two years thereafter to ensure that consideration is given to scientific and technological advances so that testing conducted in accordance with the prescribed procedures utilizing the prescribed equipment will be as accurate and reliable as science and technology permit.

75 Pa.C.S. § 1547(c)(2)(ii).

Pursuant to subsection 1547(c)(2)(ii), the Department has published a list of laboratories that are approved to conduct testing for alcohol and/or controlled substances. *See* 42 Pa. Bull. 86 (Jan. 7, 2012). That bulletin is titled "Laboratories Approved to Determine Analyses of **Blood and/or Serum** for Controlled Substances under . . . the Vehicle Code." *Id.* (emphasis added). Therein, the Department clearly states that some laboratories "are approved to perform screening and/or confirmatory analyses on blood and/or serum."[9] *Id.* Again, subsection 1547(c)(2)(ii) gives the Department of Health the authority to prescribe the procedures and equipment to be used for "blood" testing. Hence, the Department has not interpreted the term "blood" as narrowly as Alterio contends. To the contrary, the Department clearly has interpreted "blood" to mean either whole blood or blood serum. It is well-settled that great weight and deference should be afforded to the interpretation of a statute by an

---

[9] It is undisputed that the Department of Health has licensed NMS Labs, the laboratory that tested Alterio's blood, to test both whole blood and blood serum. 42 Pa. Bull. 86 (Jan. 7, 2012).

administrative agency that is charged with executing and applying it. *Dagnon*, 605 A.2d at 362 (citing *Masland v. Bachman*, 374 A.2d 517 (Pa. 1977)); 1 Pa.C.S. § 1921(c)(8).

Alterio also argues that the Department of Health, in setting minimum quantitation limits for various controlled substances, necessarily intended that blood testing be conducted only on whole blood. Brief for Alterio at 13-14. We disagree. The Department of Health's January 7, 2012 bulletin, which sets the minimum detection levels for controlled substances, describes the purpose of such minimum levels as follows:

> The minimum quantitation limits listed for each controlled substance or metabolite are the lowest concentrations that one or more of the laboratories with the least sensitive procedures in the Department's approval program for facilities offering these testing services specified they can reliably determine. . . . Confirmatory analyses employed to substantiate the presence of a drug or drug metabolite generally focus on identifying and quantitatively determining the concentration of the parent drug or a primary metabolite if extensive biotransformation occurs. The detection limits listed were developed by reviewing the minimum reportable concentrations for confirmatory analyses that laboratories in the Department's approval program specified they could measure. The concentrations listed are the highest [limits of quantitation] that any of the laboratories approved by the Department to test blood for controlled substance content specify they can reliably determine.

42 Pa. Bull. 110 (Jan. 7, 2012).

As the Department's bulletin makes clear, the purpose of minimum quantitation limits are to ensure the **reliability** of blood testing for controlled substances. The Department sets these minimum quantitation limits based upon the equipment and procedures, which are used at the

least sensitive laboratory licensed to conduct such testing. At the time that Alterio's blood was analyzed, the least sensitive laboratory licensed by the Department of Health was capable of reliably detecting blood levels of morphine as low as five nanograms per milliliter. For this reason, Alterio's effort to distinguish between whole blood and blood serum, in this context, is illogical. If the equipment and procedures used to analyze Alterio's blood could reliably detect five nanograms of morphine per milliliter of whole blood, so too could the laboratory reliably detect five nanograms of morphine per milliliter of blood serum.

Finally, Alterio relies upon **Commonwealth v. Wanner**, 605 A.2d 805 (Pa. Super. 1992), which she contends held that the word "blood," when used in the Motor Vehicle Code, specifically means "whole blood." Brief for Alterio at 10. In **Wanner**, we addressed an appellant's challenge to the sufficiency of the evidence supporting his conviction for an alcohol related DUI. 605 A.2d at 807. Alterio misunderstands our holding in **Wanner**, which plainly stated that, "[w]hile our statutes do not dictate in what form blood must be tested, only evidence of the amount of alcohol by weight in the person's blood can support a conviction [for driving under the influence of alcohol]." **Wanner**, 605 A.2d at 808 (citing **Commonwealth v. Bartolacci**, 598 A.2d 287, 288 (Pa. Super. 1991)). Indeed, it is well-settled that evidence of blood serum or plasma testing, without conversion to a whole blood result, is insufficient to sustain a conviction for an alcohol-related DUI. **See Wanner**, 605 A.2d at 809; **Bartolacci**, 598 A.2d at 288.

- 13 -

The whole blood requirement espoused in **Wanner** was not based upon the plain meaning of the word "blood."[10] Rather, our holding emphasized section 3802's treatment of alcohol-related offenses, which require that a defendant's blood alcohol content be within a specific percentage range. **Wanner**, 605 A.2d at 809; **see** 75 Pa.C.S. §§ 3802(a)-(c). Unlike alcohol-related offenses, the DUI controlled substance subsection at issue in the case *sub judice*, prohibits **any amount** of a controlled substance within a defendant's blood. 75 Pa.C.S. § 3802(d)(1). For this reason, the distinction between whole blood and blood serum is immaterial for purposes of a conviction under subsection 3802(d)(1). **Commonwealth v. Hutchins**, 42 A.3d 302, 311 (Pa. Super. 2012) (holding that "conversion of non-whole blood to whole blood test results is unnecessary because concerns about an inflated test result are irrelevant" in non-alcohol related DUI cases). Alterio was not charged with an alcohol-related DUI, nor does she present a challenge to the sufficiency of the evidence. Therefore, Alterio's reliance upon **Wanner** is misplaced.

For the foregoing reasons, we are unconvinced that either the General Assembly or the Department of Health intended for the term "blood" to be strictly confined to whole blood without any of its constituent parts removed.

_____

[10] In fact, one month after our decision in **Wanner**, we held that "blood," as used in a prior version of section 1547, encompassed both whole blood and blood serum. **Dagnon**, 605 A.2d at 362.

Accordingly, the trial court did not err in admitting the results of Alterio's blood test into evidence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/29/2014